THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ITALO SANDERS, Defendant-Appellant.

First District (6th Division)   No. 1—07—3238

Opinion filed June 26, 2009.

Randolph N. Stone and Herschella G. Conyers, both of Edwin F. Mandel Legal Aid Clinic, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald and Annette Collins, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Defendant Italio Sanders[1] appeals from the third-stage dismissal of his postconviction petition for new trial. In 1994, defendant was convicted of first-degree murder for the shooting death of John Pinkerton amidst evidence that the shooting was a gang-related crime. He subsequently filed for postconviction relief, contending that the trial court erred in failing to inquire into potential gang bias of venire members under the standard articulated in *People v. Strain*, 194 Ill. 2d 467, 742 N.E.2d 315 (2000), which provides that such inquiry must be made where gang-related evidence is integral at trial. The circuit court dismissed his petition, finding that gang-related evidence did not play a sufficient role in defendant's conviction. Defendant now appeals. For the reasons that follow, we affirm.

## I. BACKGROUND

Defendant Italio Sanders was arrested and charged with the first-degree murder of Pinkerton on April 26, 1992. The State's theory of the case was that on January 24, 1992, Pinkerton was visiting relatives at the Robert Taylor Homes housing project at 4500 South State Street in Chicago. At the time of the shooting, he was walking down

---

[1]Although the defendant's name is spelled "Italo" in the case caption, he is consistently referred to in the record as "Italio."

the fifth-floor hallway with his cousin, Alexander Robinson, and his other cousin, Manuel Woods, who was then seven years old. Defendant was allegedly standing on the nearby stairwell landing, and as the three of them walked by, he allegedly drew a gun and shot Pinkerton multiple times. Pinkerton died from his injuries two months later. The defense, for its part, denied that defendant had any involvement in the murder. It alleged that at the time of the shooting, defendant was at home in his fifteenth-floor apartment at 4500 South State Street.

The case proceeded to a jury trial. Before jury selection, the defense expressed concerns about the potential prejudicial impact of expected testimony by Michael Stewart, the victim's brother. Stewart was expected to testify that a couple days after the shooting, defendant told him that the shooting was "BD business," *i.e.*, business of the street gang known as the Black Disciples. Accordingly, defense counsel filed an *in limine* motion to exclude any evidence related to gangs. In the alternative, the defense asked the court to question the veniremen to find out whether they had any preconceived notions about gangs that might prejudice them against the defendant due to this evidence of gang affiliation.

The court denied both motions, finding that the statement was admissible as evidence of motive and that *voir dire* questioning on the subject of gangs was unnecessary. The court explained that "questions concerning an individual juror's impression or notions about gang activity, I feel, is really not relevant. It's a highly subjective question and can only, I think, have the effect to possibly inflame the other members of the venire."

In its opening statements, the State laid out its theory of the case as described above. In setting out the scene of the crime, counsel for the State described defendant as "walk[ing] along with at least two other people" in the stairwell facing the fifth-floor hallway that the victim was passing through. The State also summarized the evidence that it intended to bring against defendant. First, it said that Woods had identified defendant as the one who shot his cousin in a police lineup and that Woods would testify that defendant was the shooter. Second, it said that it would call Pinkerton's brother Stewart to testify as follows:

"[A]bout two or three days after the shooting, Michael Stewart *** saw Italio Sanders on the fifth floor, and he went up to him and asked Italio Sanders if he knew who shot his brother. Italio Sanders told him that it was BD business, it was not his business. He couldn't tell him. Italio Sanders wanted to know if his brother was dead, and at that time it was only two or three days after, he wasn't dead, and Michael Stewart said no, he's not dead. And you will

hear what Italio Sanders responded, what he said to Michael Stewart. And what he said was, 'Well, it wasn't meant for him, it was meant for the other guy that was with him.' "

The State further said that one week after the shooting, police responded to a call and saw defendant drop something in a bush while running from them. According to the State, after police apprehended defendant, they checked the bush and found a .38-caliber handgun whose characteristics were consistent with the gun that shot Pinkerton.

The State called nine-year-old Manuel Woods to testify. Manuel stated that he was Pinkerton's cousin. In January 1992, he lived with his mother in apartment 503 at 4500 State Street, and his cousin Michael Stewart lived down the hall in apartment 508.

On the night of the shooting, according to Manuel, Pinkerton and his cousin Alexander Robinson came to visit his apartment. Manuel allegedly left with them; the three of them were going to pick up Stewart and then go to watch a Bulls game together. Manuel testified that he was walking on Pinkerton's left side, holding his hand. As they went down the hall, Manuel said, he heard gunshots and saw Pinkerton "jumping." At that time, Manuel testified, he saw defendant on top of the staircase shooting at Pinkerton. He did not see anyone else on the stairwell. Manuel said that Pinkerton pushed him out of the way, and then Manuel ran to Stewart's apartment, telling him, "They shot Johnnie."

During Manuel's testimony, the State showed the jury several photographs of the area where the shooting took place and had Manuel indicate where he was standing at the time of the shooting and where he said he saw defendant. In one of the photographs, gang graffiti reading "GDs die" and "BDs live" was visible on the wall.

Manuel further testified that sometime in April 1992, he went to the police station with his mother. There, he said, he viewed a five-man lineup, from which he identified defendant as the shooter. He stated that he had seen defendant around the apartment building about four times before the shooting occurred, and defendant was the only person in the lineup that he had ever seen before.

Manuel's mother, Janese Woods, also testified; she said that she went with Manuel to view a police lineup on April 6, 1992. From five people seated in chairs, she said, he picked one as his cousin's shooter. She stated that, while she and a police officer were with Manuel in the room, neither of them said anything to him.

The State also called Alexander Robinson, Pinkerton's cousin, to testify regarding events on the night of the shooting. Robinson testified that on January 24, 1992, he went with Pinkerton to visit his

aunt Janese and his cousin Stewart. When they entered the building, he said, he saw four men, including the defendant, come in the front door. He said that they were shooting dice in front of the first floor elevator. According to Robinson, they paused for Pinkerton to speak with a girl, then went up to the fifth floor, where they saw "a lot of people out there," including the defendant.

Robinson said that after visiting apartment 503, the two of them left with Manuel for Stewart's apartment. On the way there, Robinson said, he heard shots from the stairway, looked up, and saw two people on the landing. However, Robinson testified that he did not identify defendant at the time of the shooting and did not know who shot Pinkerton.

The State also called Michael Stewart to testify. Stewart testified that Pinkerton was his youngest brother. He stated that on January 24, 1992, shortly before 7 p.m., he noticed a group of at least five men, including defendant, standing in the hallway by the elevator. According to Stewart, defendant was wearing a light blue Charlotte Hornets coat. Stewart said that he did not know defendant by name at that time, but he had seen defendant several times before, "always with other guys."

Shortly afterward, Stewart testified, he heard gunfire in the hallway, and Woods came knocking on his door screaming "they shot Johnnie." Stewart says that he ran down the hallway and saw Pinkerton lying on the floor bleeding; at that time, Stewart did not see defendant or the others he had seen earlier.

Two or three days after the shooting, according to Stewart, he saw defendant near his apartment and approached to speak with him:

"Q. What did you say?

A. I asked him, I say, you was out here on the porch the night my brother got shot and would you tell me who shot my brother.

Q. Did he say anything to you at the time?

A. He asked me was he dead.

Q. What did you say?

A. I said no, he's not.

Q. Then what did you say?

A. And he said it was BD business and he couldn't tell me anything other than that the shots weren't meant for my brother, they were meant for the n----- that was with my brother. I say that's my cousin."

Over objection, Stewart testified that he knew that "BD" stood for Black Disciples, a street gang. He also admitted that he had never told the police about this conversation with defendant, not during his meetings with them on March 27, 1992, and on April 7, 1992, nor at

any other time. He said that the first time he told the prosecutors of this conversation was on March 21, 1994, less than a week before the trial.

The State also called a number of witnesses for the purpose of establishing a link between defendant and the gun used in the shooting. Officer Curtis Thomas, a Chicago police officer, testified that early in the morning on January 31, 1992, he drove in his squad car to 4500 State Street pursuant to a call. There, he testified, he saw defendant running away from him. He allegedly followed in his squad car. While following, he allegedly saw defendant leaning over some bushes and reaching his hand in. He says that he did not see defendant holding a gun at any time. Shortly thereafter, he allegedly apprehended defendant and checked the bushes that defendant had been leaning over, whereupon he found a .38 special.

Irma Jean Pinkerton, the victim's mother, testified that after the shooting, Pinkerton was taken to Cook County Hospital, where he remained in critical condition until his death on March 24, 1992. She testified that she received her son's clothing from personnel of Cook County Hospital. When she examined the clothing, she allegedly discovered a bullet in one of his socks. She testified that she handed that bullet over to police.

Dr. Edmund Donoghue testified that he was the chief medical examiner in the Cook County medical examiner's office, and as a forensic pathologist, he was trained in determining the cause and manner of death where death was sudden, unexpected, or due to violence. He stated that on March 25, 1992, he performed an autopsy on the victim and determined that he died of complications due to multiple gunshot wounds. He also stated that he retrieved two bullets from the victim's body, which he gave to the Chicago police department crime lab.

Jerome DeRoba testified that he was a detective for the Chicago police department. He stated that on June 9, 1992, he met with Irma Pinkerton, who gave him a bullet she had found in the victim's clothes, and on October 21, 1993, he met with Dr. Baird from the Cook County Hospital, who gave him another bullet recovered from the victim's person. He stated that he took both bullets to the crime lab and inventoried them.

Detective DeRoba also testified regarding the lineup in which Manuel identified the defendant. He stated that the standard practice for lineups is to choose people from the lockup who closely resemble the suspect in appearance, height, and weight. In this case, according to Detective DeRoba, defendant was 16 years old at the time of the lineup; the other four men in the lineup were ages 18, 19, 21, and 30.

Because there was a height difference between the subjects, Detective DeRoba said, he had them all seated in chairs at the time Manuel viewed them. He characterized Manuel's identification of defendant as immediate.

James van Tilburg testified that he was a firearms examiner for the Chicago police department crime lab. He stated that when matching bullets with firearms, two characteristics of the firearms are taken into account: class characteristics, such as the type of weapon and the caliber, and individual characteristics, which are the microscopic imperfections occurring during manufacture of each weapon. He testified that he compared the .38 special retrieved from defendant with the bullets purportedly from the shooting: the one given by Irma Pinkerton, the one given by the Cook County Hospital, and the one from the medical examiner's office. Tilburg stated that all three bullets were made by the same manufacturer and had class characteristics that matched defendant's weapon. However, he said that there were insufficient individual characteristics to determine whether they had actually been fired from defendant's weapon.

The State then rested. The defense called three witnesses, all for the purpose of establishing an alibi for defendant. The first, Wanda Byles, identified herself as defendant's mother. She said that in 1992, she lived in apartment 1505 on the fifteenth floor of 4500 South State. On the evening of January 24, 1992, she was allegedly at home, along with defendant, her daughters Keisha and Chandra, defendant's girlfriend Nicole Jackson, and her neighbor's nine-month-old son Christopher. Around 6:30 p.m., she heard gunfire and ran out to the hallway to see what was happening. Defendant and Jackson also came out.

During cross-examination, the following exchange occurred:

"Q. Is it fair to say that there is—that it is common in this building for shootings to occur?

A. Occasionally.

Q. Have you been in the building when there have been other shootings?

A. No.

Q. Have you ever heard gunshots fired in that building while you were present?

A. Only that night."

Counsel for the State also asked Byles whether defendant had friends in the 4500 South State building, to which she replied, "Associates." Byles further testified that defendant had never owned a Charlotte Hornets jacket.

The defense then called her daughter, Keisha Sanders, to the stand. Keisha likewise testified that on January 24, 1992, defendant had been at home in their apartment when the shooting occurred. Counsel for the State inquired about whether she had heard gunfire in or around the building at other times; Keisha answered that in the three years she lived there, she had only heard gunfire one other time. During neither incident could she tell where the gunfire was coming from. Counsel for the State then asked:

"Q. [The shots] could have been pointed at the 15th floor where you live, right?

A. Right.

Q. It is your testimony that after these shots were fired, you and your mother and your sister ran out to this porch area that is exposed to the outside?

A. Yes."

Counsel for the State also asked Keisha whether she remembered exactly what she did on all the other dates that she was at her apartment with defendant, Jackson, and her mother, to which she responded that she did not.

Finally, the defense called Jackson to testify. Jackson stated that she was defendant's girlfriend at the time of the shooting, but that she was no longer his girlfriend. As with the other defense witnesses, she testified that she was with defendant in defendant's apartment at the time of the shooting.

The defense then rested, and the parties presented their closing arguments. During closing arguments, counsel for the State said:

"[Pinkerton] ran into a man who was about 'BD business.' BD business, ladies and gentlemen, has become our business here in this trial, this week, and today. That is the business we are about here today, BD business, and bringing justice to the man who sits before you.

Make no mistake, ladies and gentlemen, on January 24, 1992, in the hallway of 4500 South State on the fifth floor, there was Italio Sanders or maybe Italio Sanders and his associates, but certainly Italio Sanders on the landing between those two floors with the gun in his hand."

Counsel for the State went on to recap the testimony of each of its witnesses. When he reached Stewart's testimony, he described the alleged conversation between Stewart and defendant in which defendant said that the shooting was "BD business" and that Pinkerton was not the intended victim. He argued:

"What does that tell you, ladies and gentlemen? It tells you this. It tells you, who else would know who the bullets were meant for other than the person who was shooting the gun? Who else would

know that? Maybe someone else that was with him, maybe someone else that was involved in it, and certainly there may have been others, but certainly the person who shot the gun would know who the bullets were meant for."

In addition, regarding the testimony of the defense witnesses, counsel for the State said:

"Remember, ladies and gentlemen, that each one of them said that never before in the three years that they had been in that building at 4500 South State had they ever heard shots fired in the building or they ever heard a shooting in the building. If you believe that, ladies and gentlemen, then I have a building to sell you at 4500 South State that is a very—that is at a very peaceful and tranquil location, and I am offering it for a very cheap price. That simply is not the truth. It simply isn't believable."

Counsel for the State went on to say that the defense witnesses had such concern for defendant that they wished he had been home with them on the night of January 24, 1992, and that in 2½ years they had come to believe it was the case, but it was not.

During its rebuttal closing argument, counsel for the State referenced the photo of the stairwell with gang graffiti where the shooting took place: "Look closely right on the wall, ladies and gentlemen. Here it is in magic marker. 'GDs die. BDs live.' *** If you want to know what the motive in this case is, just look at the physical evidence, ladies and gentlemen. That is BD business."

On March 26, 1994, the jury found defendant guilty of first-degree murder. The judge subsequently sentenced Sanders to 40 years of imprisonment. Defendant appealed his conviction, alleging, among other things, that the trial court erred in allowing admission of gang evidence and that it conducted an inadequate *voir dire* by failing to ask prospective jurors questions regarding potential gang bias. We affirmed his conviction. *People v. Sanders*, No. 1—94—1710 (1996) (unpublished order under Supreme Court Rule 23). His petition for leave to appeal to the Illinois Supreme Court was denied on April 2, 1997. *People v. Sanders*, 172 Ill. 2d 563, 679 N.E.2d 384 (1997).

■ Four years later, and seven years after his conviction, on November 21, 2001, defendant filed a petition for postconviction relief. He alleged that the trial court's failure to *voir dire* potential jurors for gang bias, in tandem with the State's reliance on prejudicial gang-related evidence at trial, constituted a substantial denial of his right to an impartial jury. In support, he cited the 2000 *Strain* decision (*Strain*, 194 Ill. 2d 467, 742 N.E.2d 315), in which the Illinois Supreme Court held that trial courts must ask potential jurors about bias against street gangs if gang-related evidence forms an integral part of the evidence to be produced at trial.

The circuit court denied defendant's petition, finding that it was untimely and that he had not established a lack of culpable negligence, as was needed to excuse an untimely filed petition. Defendant appealed that dismissal, and we reversed and remanded, finding that it was procedurally improper to dismiss a postconviction petition on grounds of untimeliness at the first stage of postconviction proceedings. *People v. Sanders*, No. 1—02—0880 (2003) (unpublished order under Supreme Court Rule 23).

Following our remand, the circuit court found that the petition was not untimely or barred by the doctrine of *res judicata* pursuant to the recent decision of *People v. Gardner*, 331 Ill. App. 3d 358, 771 N.E.2d 26 (2002), in which it was held that a defendant could bring a postconviction petition based on *Strain* even though the ordinary statutory period for a postconviction petition had expired and he had already unsuccessfully pursued the same issue on direct appeal. The circuit court accordingly undertook substantive consideration of whether gang evidence was integral to defendant's trial so as to require gang-related *voir dire* questioning under *Strain*. The court found that the trial was primarily an eyewitness case with only "scant references" to gangs that could not reasonably have inflamed the jurors' passions. Therefore, the court dismissed defendant's petition. It is from this dismissal that defendant now appeals.

## II. ANALYSIS

On appeal, the State contends that the dismissal of Sanders' petition should be affirmed for three reasons. First, it argues that the *Strain* decision should not be applied retroactively to defendant's case. Second, it argues that defendant's petition is time-barred, regardless of his reliance on the after-filed *Strain*. Third, it argues that even if we were to consider his petition on the merits under the principles in *Strain*, the facts of his case still would not justify granting of a new trial, as the gang-related evidence was not sufficiently prevalent at trial.

## A. Retroactive Application of *Strain*

The State first contends that defendant's petition is barred under the doctrine of *res judicata*, as the appellate court already rejected his contention of inadequate gang-related *voir dire* on direct appeal. Defendant argues that *res judicata* does not apply, as the law has changed since his direct appeal was decided, thanks to the *Strain* decision. However, the State argues that *Strain* should not be applied retroactively to defendant's case, since the *voir dire* requirements set out in *Strain* constitute a "new rule." We agree with the State.

Postconviction petitions are generally subject to the doctrine of *res judicata*, which bars consideration of issues that have previously been raised and decided on direct appeal. *People v. Blair*, 215 Ill. 2d 427, 443, 831 N.E.2d 604, 614-15 (2005). However, there is an exception to this doctrine: If the law has changed since defendant's direct appeal was decided, then fundamental fairness dictates that defendant may raise issues in his postconviction petition that were rejected on direct appeal. *People v. Partee*, 268 Ill. App. 3d 857, 863, 645 N.E.2d 414, 419 (1994) (defendant allowed to re-raise *Batson* issue in his postconviction petition that had been rejected on direct appeal because the law on the issue had changed), citing *People v. Cowherd*, 114 Ill. App. 3d 894, 898, 449 N.E.2d 589, 591-92 (1983).

In this case, defendant argues that *Strain* represents a change in the law, thereby allowing him to raise the issue of inadequate *voir dire* questioning with respect to gang bias even though he already obtained a ruling on direct appeal. The State, on the other hand, argues that *Strain* should not be retroactively applied to defendant's case; therefore, the law with respect to defendant's case remains unchanged, and *res judicata* bars his present claim.

■ Illinois has adopted the retroactivity standards set out by the United States Supreme Court in *Teague v. Lane*, 489 U.S. 288, 301, 103 L. Ed. 2d 334, 349, 109 S. Ct. 1060, 1070 (1989), which provides a three-step process for determining whether a newly decided case can be applied on collateral review. *People v. Flowers*, 138 Ill. 2d 218, 237, 561 N.E.2d 674, 681-82 (1990) (adopting *Teague*). First, the court determines the date that the defendant's conviction became final, which is when " 'the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.' " *People v. Kizer*, 318 Ill. App. 3d 238, 246, 741 N.E.2d 1103, 1110 (2000), quoting *Caspari v. Bohlen*, 510 U.S. 383, 390, 127 L. Ed. 2d 236, 246, 114 S. Ct. 948, 953 (1994).

Second, the court determines whether the rule that defendant appeals to (in this case, the rule articulated by the holding in *Strain*) existed at the time the conviction became final. If the answer is yes, then no further inquiry is needed; the rule will be applied on collateral review, "since it is the law that should have been utilized in the first place." *Kizer*, 318 Ill. App. 3d at 246, 741 N.E.2d at 1110. However, if the answer is no—*i.e.*, the rule is a "new rule"—then the court proceeds to the third step of analysis. *Kizer*, 318 Ill. App. 3d at 247, 741 N.E.2d at 1110. A "new rule" will not be applied on collateral review unless either it decriminalizes an entire category of conduct or it involves a "watershed" rule of criminal procedure that alters the

bedrock procedural elements needed for a fair trial. *Kizer*, 318 Ill. App. 3d at 247, 741 N.E.2d at 1111, citing *Sawyer v. Smith*, 497 U.S. 227, 241, 111 L. Ed. 2d 193, 211, 110 S. Ct. 2822, 2831 (1990).

In this case, defendant concedes that the *Strain* decision came after his conviction became final. Defendant also does not contend that either of the third-stage exceptions apply. Rather, the contested issue is whether the *Strain* decision represents a "new rule" under *Teague*.

In deciding this issue, we are mindful that our supreme court has stated that retroactive application of decisions " 'seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect.' " *Flowers*, 138 Ill. 2d at 239, 561 N.E.2d at 682, quoting *Teague*, 489 U.S. at 309, 103 L. Ed. 2d at 355, 109 S. Ct. at 1074. Furthermore, retroactivity is "intrusive" in that it "continually forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." (Emphasis omitted.) *Butler v. McKellar*, 494 U.S. 407, 413-14, 108 L. Ed. 2d 347, 355-56, 110 S. Ct. 1212, 1217 (1990).

The *Teague* court explained that "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. [Citations.] To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301, 103 L. Ed. 2d at 349, 109 S. Ct. at 1070; see also *Gray v. Netherland*, 518 U.S. 152, 166, 135 L. Ed. 2d 457, 473, 116 S. Ct. 2074, 2083 (1996) (decision constitutes "new rule" unless " 'a state court considering [the petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution' "), quoting *Saffle v. Parks*, 494 U.S. 484, 488, 108 L. Ed. 2d 415, 424, 110 S. Ct. 1257, 1260 (1990). Thus, for instance, where a decision requires conduct that was previously proscribed (see *People v. Britz*, 112 Ill. 2d 314, 319, 493 N.E.2d 575, 577 (1986) (case of *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984), constituted a new rule where the Illinois Supreme Court rules at the time of defendant's trial prohibited the kind of *voir dire* questioning required by *Zehr*)), or where it explicitly rejects a proposition that it earlier advanced (see *Teague*, 489 U.S. at 301, 103 L. Ed. 2d at 349, 109 S. Ct. at 1070 (defendant's contention that the jury must proportionally represent the community would require a new rule in light of case law asserting lack of such requirement)), it is clearly a new rule. However, it is not necessary for a decision to do

either of these two things for it to be considered a new rule. Indeed, as the Supreme Court has stated:

"[T]he fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague*. Courts frequently view their decisions as being 'controlled' or 'governed' by prior opinions even when aware of reasonable contrary conclusions reached by other courts." *Butler*, 494 U.S. at 415, 108 L. Ed. 2d at 356, 110 S. Ct. at 1217.

The *Butler* Court applied this principle to find that the decision in *Arizona v. Roberson*, 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093 (1988), prohibiting police interrogation of a subject who had requested counsel in the context of a separate investigation, was a new rule and therefore could not be applied retroactively on collateral review. *Butler*, 494 U.S. at 415, 108 L. Ed. 2d at 357, 110 S. Ct. at 1217-18. The Court reasoned that although the *Roberson* Court believed its ruling to be within the "logical compass" of prior case law, its decision was still "susceptible to debate among reasonable minds" and was therefore not dictated by precedent as required by *Teague*. *Butler*, 494 U.S. at 415, 108 L. Ed. 2d at 356, 110 S. Ct. at 1217.

The Illinois Supreme Court applied similar reasoning in *Flowers*, 138 Ill. 2d 218, 561 N.E.2d 674, when it found that a new rule had been enunciated by the court in *People v. Reddick*, 123 Ill. 2d 184, 526 N.E.2d 141 (1988) (for voluntary manslaughter conviction, State does not have the burden of raising the required mitigating mental states, but for murder conviction, if defendant raises those mental states as affirmative defense, State has burden of disproving them). The *Flowers* court acknowledged that the *Reddick* decision was "doctrinally consistent with existing laws" but further found that the court's conclusion "did not necessarily flow from the statutory analysis." *Flowers*, 138 Ill. 2d at 240, 561 N.E.2d at 683.

On the other hand, in *People v. Moore*, 177 Ill. 2d 421, 432, 686 N.E.2d 587, 594 (1997), the Illinois Supreme Court found that its prior decision in *People v. Kilpatrick*, 167 Ill. 2d 439, 657 N.E.2d 1005 (1995), was not a new rule. The *Kilpatrick* court held that a trial court may not impose a longer sentence on reconsideration even if the defendant's aggregate imprisonment is not increased, because "[b]y its express terms, section 5—8—1(c) [of the Unified Code of Corrections] forbids the increase in a sentence once it has been imposed." *Kilpatrick*, 167 Ill. 2d at 446, 657 N.E.2d at 1008, citing 730 ILCS 5—8—1(c) (West 1992) ("However, the court may not increase a sentence once it is imposed"). The *Kilpatrick* court reasoned that the

plain language of the Code would not permit a contrary ruling. *Kilpatrick*, 167 Ill. 2d at 447, 657 N.E.2d at 1008. The *Moore* court reaffirmed this analysis, explaining that under existing case and statutory law, any other decision would have been "clearly improper," such that the *Kilpatrick* decision "merely applied existing precedent and statutory law to the facts of the case." *Moore*, 177 Ill. 2d at 433, 686 N.E.2d at 594.

Thus, the *Moore* court found that *Butler* was distinguishable, because, unlike in *Butler*, it was not presented with a situation where "*reasonable* contrary conclusions [had been] reached by other courts" (emphasis added) (*Butler*, 494 U.S. at 415, 108 L. Ed. 2d at 356, 110 S. Ct. at 1217). Although it acknowledged that a contrary conclusion had previously been reached by the appellate court in *People v. Todd*, 263 Ill. App. 3d 435, 636 N.E.2d 114 (1994), it further found that the *Todd* decision was "illogical and an unreasonable interpretation of prior precedent and statutory law" to the extent that it contradicted the holding of *Kilpatrick*. *Moore*, 177 Ill. 2d at 436, 686 N.E.2d at 595. The *Moore* court explained that, if the *Kilpatrick* court had followed the *Todd* decision, it would have been an irrational divergence from the unambiguous language of the statute as well as pre-*Todd* precedent involving that issue. *Moore*, 177 Ill. 2d at 436, 686 N.E.2d at 595.

With regard to the present case, we find that the *Strain* decision more closely resembles the decisions examined in *Butler* and *Flowers* than the decision examined in *Moore*, thereby rendering it beyond the reach of retroactive application.

It is a long-standing principle in Illinois law that the manner and scope of *voir dire* questioning lies within the discretion of the trial court, which possesses "great latitude" in determining the questions to be asked. *People v. Terrell*, 185 Ill. 2d 467, 484, 708 N.E.2d 309, 318 (1998). Furthermore, prior to the *Strain* decision, Illinois courts had held that prospective jurors generally should not be questioned about responses to specific evidence to be introduced at trial, because such questioning might have a negative effect on the impartiality of the jury. *Strain*, 194 Ill. 2d at 483, 742 N.E.2d at 324-25 (Heiple, J., dissenting), citing *People v. Buss*, 187 Ill. 2d 144, 179-80, 718 N.E.2d 1 (1999), *abrogated on other grounds by In re G.O.*, 191 Ill. 2d 37, 46-50, 727 N.E.2d 1003, 1008-10 (2000); see also *Gardner v. Barnett*, 199 F.3d 915, 921 (7th Cir. 1999) (finding that gang bias *voir dire* questioning is not required under the federal constitution and may, in some cases, be detrimental to a fair trial because it may "educate some persons whose understanding of gangs is limited, and create prejudice where none existed before").

In light of this existing law, it would not have been unreasonable if the Illinois Supreme Court had chosen to maintain the status quo by leaving the issue of gang bias *voir dire* questioning to the discretion of the trial judge in each individual case. In fact, the Illinois Supreme Court seemed potentially inclined toward such a position in *People v. Porter*, 111 Ill. 2d 386, 489 N.E.2d 1329 (1986). The *Porter* court found no error where the trial court refused a defense request to ask potential jurors about their feelings regarding gang members. *Porter*, 111 Ill. 2d at 400-01, 489 N.E.2d at 1335. The extent to which gang evidence played a part at trial is unclear. On appeal, defendant contended that the *voir dire* questioning had been inadequate, although he did not specifically raise the lack of *voir dire* as to gang bias as a point of error. The court found that the trial court acted within its discretion, as defendant's right to an impartial jury had not been violated. *Porter*, 111 Ill. 2d at 402, 489 N.E.2d at 1335.

*Strain* thus represented a distinct progression in the law in its holding that, where gang evidence is integral at trial, the failure to allow *voir dire* as to gang bias is deemed to be a *per se* abuse of the trial court's discretion. *Strain*, 194 Ill. 2d at 477, 742 N.E.2d at 321. The decision places a stringent limitation upon the broad range of discretion traditionally afforded to the trial court. Therefore, although the rule enunciated in *Strain* is doctrinally consistent with prior law and thus within its "logical compass" (*Butler*, 494 U.S. at 415, 108 L. Ed. 2d at 356, 110 S. Ct. at 1217), as was the case in *Flowers*, it cannot be said that it was mandated by prior law such that a contrary decision would have been "illogical and *** unreasonable" (*Moore*, 177 Ill. 2d at 436, 686 N.E.2d at 595). See *Strain*, 194 Ill. 2d at 482, 742 N.E.2d at 323 (Miller, J., dissenting) (discussing countervailing concerns and precedent); *Strain*, 194 Ill. 2d at 483, 742 N.E.2d at 324-25 (Heiple, J., dissenting) (same). Consequently, under the standard articulated in *Butler* and *Flowers*, the *Strain* decision constitutes a new rule which does not apply retroactively to defendant's case on collateral review.

Defendant nevertheless urges us to follow the decision in *Gardner*, 331 Ill. App. 3d at 367, 771 N.E.2d at 34, where, under similar facts to the case at hand, the court found that *Strain* had retroactive application. The *Gardner* defendant was convicted of first-degree murder in 1995, and his conviction was affirmed on direct appeal in 1996. *Gardner*, 331 Ill. App. 3d at 360, 771 N.E.2d at 28. In December 2000, he filed a postconviction petition in which he argued, based on the *Strain* decision, that he was entitled to a new trial due to insufficient *voir dire* questioning regarding prejudice against gang members. The *Gardner* court found that *Strain* applied retroactively to the defendant's case, and, as shall be discussed in further detail below, it also found

that defendant's untimely filing was excused because it was not due to culpable negligence on his part. *Gardner*, 331 Ill. App. 3d at 365, 367, 771 N.E.2d at 32-33. The *Gardner* court based its view of *Strain*'s retroactivity on the fact that *Strain* was premised upon Supreme Court Rule 431 (177 Ill. 2d R. 431), governing *voir dire* procedure, as well as upon case law discussing the purpose of *voir dire*. *Gardner*, 331 Ill. App. 3d at 367, 771 N.E.2d at 33. "Given the court's reliance on precedential case law and its reference to long-standing principles surrounding *voir dire*," concluded the court, "we find the *Strain* court did not intend to announce a 'new rule.' " *Gardner*, 331 Ill. App. 3d at 367, 771 N.E.2d at 34.

As much as we respect the opinions of the *Gardner* court, we cannot align ourselves with its analysis on this matter. The *Butler* and *Flowers* decisions both demonstrate that the mere fact that a decision is premised upon prior law is insufficient to establish that a rule announced in this case is not new. *Butler*, 494 U.S. at 415, 108 L. Ed. 2d at 356, 110 S. Ct. at 1217; *Flowers*, 138 Ill. 2d at 240, 561 N.E.2d at 683. Rather, the pertinent question is whether the decision was *mandated* by prior law, rather than merely being consistent with prior law yet still susceptible to "reasonable contrary conclusions." *Butler*, 494 U.S. at 415, 108 L. Ed. 2d at 356, 110 S. Ct. at 1217. As has been discussed, such is not the case with regard to the *Strain* decision. Moreover, the only case that the *Gardner* court cites in support of its understanding of the new rule doctrine is *Moore*, which is distinguishable as discussed above: the *Moore* court premised its view of *Kilpatrick*'s retroactivity on its finding that the *Kilpatrick* court could not logically have made any other decision than the one it made, while the *Strain* court was not likewise bound.

Accordingly, because *Strain* does not apply retroactively to defendant's case, the issue of inadequate *voir dire* that defendant raises in his postconviction petition warrants dismissal under the doctrine of *res judicata*.

### B. Untimeliness of Defendant's Petition

Even if we were to adopt the *Gardner* court's view of *Strain*'s retroactivity, our decision would remain unchanged, due to the untimeliness of defendant's petition. Here, too, our finding is at variance with that of the court in *Gardner*. The State urges that defendant's petition warrants dismissal because defendant did not file his petition until several years after the statutory filing deadline had passed and because defendant lacked sufficient justification for his tardiness. For the reasons discussed below, we agree.

The Post-Conviction Hearing Act (Act) (725 ILCS 5/122—1 *et seq.* (West 2006)) sets out the process for adjudicating postconviction petitions. At the time defendant filed his petition, the timeliness requirements under the Act for such petitions were as follows:

> "No proceedings under this Article shall be commenced more than 6 months after the denial of a petition for leave to appeal or the date for filing such a petition if none is filed or more than 45 days after the defendant files his or her brief in the appeal of the sentence before the Illinois Supreme Court (or more than 45 days after the deadline for the filing of the defendant's brief with the Illinois Supreme Court if no brief is filed) or 3 years from the date of conviction, whichever is sooner, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence." 725 ILCS 5/122—1(c) (West 2000).

In this case, defendant's postconviction petition was filed over four years after the denial of his petition for leave to appeal to the Illinois Supreme Court (*People v. Sanders*, 172 Ill. 2d 563, 679 N.E.2d 384 (1997)) and over seven years from the date of his conviction. Therefore, there is no question that defendant's petition was filed well after the statutory limitations period had expired. The State contends that defendant was perfectly capable of bringing a timely petition raising the issues presented here, albeit without the support of *Strain*, and his volitional failure to do so constitutes culpable negligence. Defendant, on the other hand, argues that it would be fundamentally unfair to dismiss his claim on grounds of timeliness where the case that forms the basis of his petition was not decided until after the statutory deadline had passed, relying on *Gardner*, 331 Ill. App. 3d 358, 771 N.E.2d 26.

In *Gardner*, as in the present case, the defendant filed an untimely postconviction petition seeking relief under *Strain*, which had not been decided at the time that the filing deadline had passed. In dealing with the timeliness issue, the *Gardner* court found that the defendant's untimely filing was not due to culpable negligence on his part, reasoning that culpable negligence, as defined in prior case law, meant " 'more than the failure to use ordinary care' or 'negligence of a gross and flagrant character.' " *Gardner*, 331 Ill. App. 3d at 365, 771 N.E.2d at 32, quoting *People v. Scullark*, 325 Ill. App. 3d 876, 885, 759 N.E.2d 565, 575 (2001). In applying that definition, the *Gardner* court found:

> "As defendant points out, he pursued the gang bias *voir dire* issue on direct appeal, in a petition for leave to appeal the decision on direct appeal, and before the federal court in a *habeas corpus* proceeding. His argument was rejected in each of these venues.

Given that defendant raised the issue on direct appeal, defendant could not have argued it again in a postconviction petition before the supreme court issued its decision in *Strain* because it would have been barred by *res judicata*. [Citation.] We do not see how defendant's failure to raise the issue yet again, in a postconviction petition that would have been doomed to fail pre-*Strain*, constitutes 'negligence of a gross and flagrant character.' " *Gardner*, 331 Ill. App. 3d at 365, 771 N.E.2d at 32.

The State, on the other hand, relies on the case of *People v. Walker*, 331 Ill. App. 3d 335, 344, 772 N.E.2d 758, 766 (2002), where the court addressed this precise situation but reached a contrary conclusion. In dismissing defendant's petition for postconviction relief, the *Walker* court found that his reliance on a decision filed after the postconviction deadline had passed was insufficient to absolve him of culpable negligence so as to excuse his late filing. *Walker*, 331 Ill. App. 3d at 344, 772 N.E.2d at 766 ("we do not believe *Apprendi*'s unavailability to a petitioner during the applicable filing period, standing alone, constitutes a valid excuse for a belated filing"). It further declined to apply the cause-and-prejudice test to determine whether fundamental fairness required consideration of his claim on the merits. *Walker*, 331 Ill. App. 3d at 346, 772 N.E.2d at 768 (stating that the culpable negligence standard is a sufficient safety valve with respect to untimely filed petitions).

Once more, despite our respect for the *Gardner* court, we are unable to agree with its reasoning on this matter. While, as shall be more fully discussed later in this opinion, we disagree with the *Walker* court on the applicability of the cause-and-prejudice test to accommodate untimely filed postconviction petitions, we agree with the *Walker* court that, under the rubric of culpable negligence, the deadline for filing an initial postconviction petition is not deferred merely due to the emergence of subsequent legal developments that give defendant a stronger legal position to argue from.

At the outset, we note that the *Gardner* court is somewhat inconsistent in finding, on the one hand, that the principles underlying *Strain* were sufficiently well enshrined in prior law to give *Strain* retroactive application, and, on the other hand, implying that there was insufficient support in the law upon which to predicate defendant's requested *voir dire* mandate before *Strain*. As discussed in *Gardner*, these principles were already present in the law at the time defendant's conviction became final on direct appeal. See, *e.g.*, *People v. Jimenez*, 284 Ill. App. 3d 908, 912-13, 672 N.E.2d 914, 917 (1996) (discussing *voir dire* questioning of potential jurors regarding gang bias). Thus, even if we were to accept the *Gardner* court's view of *Strain's*

retroactivity, as well as the *Gardner* court's application of the culpable negligence standard, in which the lack of a timely filing is excused where any such filing would be "doomed to fail" (*Gardner*, 331 Ill. App. 3d at 365, 771 N.E.2d at 32) by lack of legal support, it is not at all clear that defendant's position was doomed to fail in light of the existing law at that time.

More overridingly, we feel compelled to disagree with the *Gardner* court's reasoning because it appears to inappropriately apply the culpable negligence standard in light of the context in which it has been previously applied under existing law, namely, to excuse untimely filings where outside forces intervene to prevent defendants from meeting the deadline. Thus, for instance, if a defendant fails to file his postconviction petition in a timely manner because he has been placed in prison segregation without his legal materials through no fault of his own, he lacks culpable negligence and his late filing will be excused. *People v. Scullark*, 325 Ill. App. 3d 876, 885, 759 N.E.2d 565, 575 (2001). Furthermore, when a defendant files his petition late due to reliance on the incorrect advice of his appellate counsel regarding the deadline, where the reliance is reasonable and there is no reason for the defendant to doubt his counsel's advice, that too will be excused due to lack of culpable negligence. *People v. Rissley*, 206 Ill. 2d 403, 421, 795 N.E.2d 174, 184 (2003).

As can be gleaned from these various contexts in which the standard has been applied, the rubric of "culpable negligence" does not apply well to a situation where a defendant does not file a timely postconviction petition because of the relative lack of merit of the arguments available to him in a timely fashion, but he thereafter discovers subsequent legal developments which give greater strength or merit to his position. Indeed, the line of reasoning adopted by the *Gardner* court and urged by defendant in the current case does not assert that defendant was not cognizant of the deadline due to no fault of his own, nor that defendant was not able to meet the deadline due to no fault of his own, but merely that there would be no foreseeable tactical benefit to filing a petition before the *Strain* decision was handed down. See *Gardner*, 331 Ill. App. 3d at 365, 771 N.E.2d at 32. In such a situation, there are no outside forces preventing the defendant from filing a timely petition; rather, it is the perceived futility of filing that prompts defendant's choice not to file. The defendant's decision not to meet the deadline may, in fact, be fully intentional and thus clearly a "conscious choice of a course of action," as culpable negligence has been described by our supreme court in *People v. Boclair*, 202 Ill. 2d 89, 106, 789 N.E.2d 734, 744 (2002) (defining culpable negligence as a " 'conscious choice of a course of action, in

disregard of the consequences' "), quoting *People v. Decina*, 2 N.Y.2d 133, 140, 138 N.E.2d 799, 803-04, 157 N.Y.S.2d 558, 565 (1956).

Accordingly, we find that the "culpable negligence" framework does not adequately address situations such as the present one, where a defendant deliberately allows the filing period to run and then seeks to reopen the filing period when the law evolves in a posture that is more favorable to him. Contrary to the decision in *Walker*, we find that claims such as the one in the instant case more appropriately lend themselves to analysis under the cause-and-prejudice standard which applies to mitigate the strictures of the Act with respect to the filing of successive postconviction petitions under *People v. Pitsonbarger*, 205 Ill. 2d 444, 458, 793 N.E.2d 609, 621 (2002). Just as the Act bars untimely postconviction petitions absent a showing of lack of culpable negligence under section 122—1(c), it also bars successive postconviction petitions under section 122—3, which provides: "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122—3 (West 2006). However, it is well established in Illinois that, where "fundamental fairness" demands, this statutory bar to successive postconviction petitions will be relaxed. *Pitsonbarger*, 205 Ill. 2d at 458, 793 N.E.2d at 621, citing *People v. Flores*, 153 Ill. 2d 264, 274, 606 N.E.2d 1078, 1083 (1993). For this to occur in cases not involving actual innocence claims or the death penalty, defendant must meet the cause-and-prejudice test articulated by the United States Supreme Court with respect to successive habeas corpus petitions (*McCleskey v. Zant*, 499 U.S. 467, 113 L. Ed. 2d 517, 111 S. Ct. 1454 (1991)) and adopted by the Illinois Supreme Court with respect to successive postconviction petitions in *Pitsonbarger*, 205 Ill. 2d at 459, 793 N.E.2d at 621. See also *Flores*, 153 Ill. 2d at 279, 606 N.E.2d at 1085 (acknowledging the appropriateness of the cause-and-prejudice test to determine whether fundamental fairness requires consideration of successive postconviction petition). Under this test, a procedural default will be excused if defendant can show (1) cause, defined as an objective factor external to the defense that impeded the defense's efforts to raise the claim earlier (*Flores*, 153 Ill. 2d at 279, 606 N.E.2d at 1085, citing *McCleskey*, 499 U.S. at 493, 113 L. Ed. 2d at 544, 111 S. Ct. at 1470), and (2) prejudice, defined as an error which infected the trial to an extent that the defendant's conviction is a violation of due process (*Flores*, 153 Ill. 2d at 279, 606 N.E.2d at 1085, citing *United States v. Frady*, 456 U.S. 152, 169, 71 L. Ed. 2d 816, 831, 102 S. Ct. 1584, 1595 (1982)).

We find the situation at hand, in which a defendant seeks in the first instance to file an untimely postconviction petition because of a

change in the law that occurred after the filing deadline had passed, to be analogous to the situation in which a defendant has already filed an unsuccessful postconviction petition, but seeks to file a successive postconviction petition because of a change in the law that occurred after the rejection of his first petition. In both situations, defendant is arguing that his procedural default should be excused due to a development in the law that, he contends, occurred too late for him to take advantage of it without relaxation of the statutory rules. Accordingly, there is a symmetry between these situations, such that the standards for excusing a procedural default in the former are the same as in the latter. As shall be developed in more detail below, the Illinois Supreme Court has held that there could be cause for the filing of a successive postconviction petition where the constitutional claim brought in that petition " 'is so novel that its legal basis is not reasonably available to counsel' " at the time when the earlier petition was filed. *Pitsonbarger*, 205 Ill. 2d at 461, 793 N.E.2d at 622, quoting *Reed v. Ross*, 468 U.S. 1, 16, 82 L. Ed. 2d 1, 15, 104 S. Ct. 2901, 2910 (1984); see *People v. McDonald*, 364 Ill. App. 3d 390, 394, 846 N.E.2d 960, 965-66 (2006) (analyzing whether after-filed cases constituted cause for a successive postconviction petition under *Pitsonbarger*, but ultimately dismissing defendant's petition on grounds that the legal propositions advanced in the after-filed cases were not sufficiently novel). This same allowance, but no greater, should be granted where an initial, untimely postconviction petition is at stake. There would not appear to be any cogent basis to differentiate between, on the one hand, a defendant who files a timely but legally vulnerable postconviction petition and who later wishes to file a successive petition to take advantage of a subsequent legal development which strengthens his position and, on the other hand, a defendant who understands the weakness of his legal position and declines to file on a timely basis but later wishes to avail himself of that same subsequent legal development. Thus, to the extent that the formal time requirements under the Act are relaxed with respect to successive petitions, they should be equally relaxed— but no more—with respect to initial untimely petitions.

Therefore, if a defendant never filed a postconviction petition within the time limits prescribed by section 122—1(c), but he can meet the cause and prejudice test with respect to his late-filed petition, his late filing should be viewed under the same fundamental fairness concerns which animate the *Pitsonbarger* and *Flores* decisions.

Thus the first relevant inquiry is whether there was cause for defendant's failure to raise his present argument in a timely postconviction petition. In that regard, the *Pitsonbarger* court stated that " ' "a showing that the factual or legal basis for a claim was not

reasonably available to counsel \*\*\* would constitute cause under this standard." ' " *Pitsonbarger*, 205 Ill. 2d at 460, 793 N.E.2d at 622, quoting *Strickler v. Greene*, 527 U.S. 263, 283 n.24, 144 L. Ed. 2d 286, 303 n.24, 119 S. Ct. 1936, 1949 n.24 (1999), quoting *Murray v. Carrier*, 477 U.S. 478, 488, 91 L. Ed. 2d 397, 408, 106 S. Ct. 2639, 2645 (1986), citing *Reed*, 468 U.S. at 16, 82 L. Ed. 2d at 15, 104 S. Ct. at 2910. In other words, cause exists " 'where a constitutional claim is so novel that its legal basis is not reasonably available to counsel' " at the time of the original procedural default. *Pitsonbarger*, 205 Ill. 2d at 461, 793 N.E.2d at 622, quoting *Reed*, 468 U.S. at 16, 82 L. Ed. 2d at 15, 104 S. Ct. at 2910. The *Reed* Court explained the reasoning behind this rule as follows:

"Counsel's failure to raise a claim for which there was no reasonable basis in existing law does not seriously implicate any of the concerns that might otherwise require deference to a State's procedural bar. Just as it is reasonable to assume that a competent lawyer will fail to perceive the possibility of raising such a claim, it is also reasonable to assume that a court will similarly fail to appreciate the claim. \*\*\*

\*\*\* [I]f we were to hold that the novelty of a constitutional question does not give rise to cause for counsel's failure to raise it, we might actually disrupt state-court proceedings by encouraging defense counsel to include any and all remotely constitutional claims that could, some day, gain recognition." *Reed*, 468 U.S. at 15-16, 82 L. Ed. 2d at 14-15, 104 S. Ct. at 2910.

In *Reed*, defendant brought a federal *habeas* proceeding, alleging that faulty jury instructions required reversal of his conviction based upon a United States Supreme Court decision that was decided six years after his conviction. Under such circumstances, the *Reed* Court found that there was cause for defendant's failure to raise the jury instruction issue on direct appeal as required by state law. *Reed*, 468 U.S. at 20, 82 L. Ed. 2d at 18, 104 S. Ct. at 2912.

In *Smith v. Murray*, 477 U.S. 527, 91 L. Ed. 2d 434, 106 S. Ct. 2661 (1986), the Supreme Court refined the *Reed* standard for cause as it pertains to subsequent legal developments. "[T]he question is not whether subsequent legal developments have made counsel's task easier," said the Court, "but whether at the time of the default the claim was 'available' at all." *Smith*, 477 U.S. at 537, 91 L. Ed. 2d at 446, 106 S. Ct. at 2667. The defendant in *Smith* filed for federal *habeas*, raising an argument about admissibility of testimony which he had failed to raise on direct appeal before the state supreme court. *Smith*, 477 U.S. at 530-31, 91 L. Ed. 2d at 442, 106 S. Ct. at 2664. He argued that two Supreme Court decisions, filed well after his conviction

became final on direct appeal, lent support to his contention that the testimony at issue should have been excluded. *Smith*, 477 U.S. at 536, 91 L. Ed. 2d at 446, 106 S. Ct. at 2667. The *Smith* Court nevertheless dismissed his claim, because "various forms of the claim he now advances had been percolating in the lower courts for years at the time of his original appeal." *Smith*, 477 U.S. at 537, 91 L. Ed. 2d at 446, 106 S. Ct. at 2667. Thus, even though defendant's position might have been strengthened by subsequent Supreme Court precedent, his argument was still "available" at the time that defendant chose not to pursue it, and defendant still bore full responsibility for that tactical choice.

The foregoing reasoning would be all the more applicable to the facts of the instant case if we were to follow the *Gardner* court's lead in finding that the *Strain* decision applied retroactively to defendant's case, since those very factors that would provide for retroactivity would negate any excuse or cause for defendant's failure to raise the issue of inadequate *voir dire* questioning in a timely postconviction petition. That is, if we were to accept defendant's argument that the holding in *Strain* did not represent a new rule, but already existed as "the law that should have been utilized in the first place" (*Kizer*, 318 Ill. App. 3d at 246, 741 N.E.2d at 1110), then we cannot simultaneously accept a contention that, prior to *Strain*, defendant's argument had "no reasonable basis in existing law" (*Reed*, 468 U.S. at 15, 82 L. Ed. 2d at 14, 104 S. Ct. at 2910), such as would constitute cause for his lack of timely filing. See *Smith*, 477 U.S. at 537, 91 L. Ed. 2d at 446, 106 S. Ct. at 2667; accord *McDonald*, 364 Ill. App. 3d at 394, 846 N.E.2d at 965-66 (rejecting defendant's argument that cases decided after the dismissal of his initial postconviction petition constituted cause for him to file a successive postconviction petition, since the legal principles advanced in those cases were present in case law that existed at the time of his initial petition and therefore not sufficiently novel).

Based on our finding that defendant's petition is procedurally barred due to both *res judicata* and untimeliness, we need not determine whether sufficient gang-related evidence was adduced at trial to require gang-bias *voir dire* under *Strain*. Accordingly, we affirm the trial court's dismissal of defendant's petition.

Affirmed.

McBRIDE and CAHILL, JJ., concur.