2024 IL App (1st) 230879-U

No. 1-23-0879

Order filed December 11, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 12469 |
| | ) | |
| WILLIAM WADE, | ) | Honorable |
| | ) | Margaret Ogarek, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Martin and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: The judgment of the trial court, which denied defendant's postconviction actual innocence claim after a third-stage hearing and dismissed his ineffective assistance of counsel claims at the second stage, is affirmed.

¶ 2    Defendant William Wade was found in an apartment with drugs worth up to $200,000 and multiple firearms. He alleged in his petition for postconviction relief that he is innocent and that his trial counsel provided ineffective assistance. Of particular note, defendant alleged that the true

owner of the drugs and guns approached trial counsel and offered his assistance in clearing defendant's name, but trial counsel refused his assistance.

¶ 3        Defendant was ultimately found guilty of armed habitual criminal, possession of cocaine with intent to distribute, and possession of cannabis with intent to distribute, and is now serving concurrent prison terms of 30 years, 30 years, and seven years, respectively.

¶ 4        The trial court dismissed defendant's ineffective assistance of counsel claims at a second stage hearing but granted defendant an evidentiary hearing on his actual innocence claim. However, the trial court denied defendant's petition following an evidentiary hearing. Defendant now appeals those two orders.

¶ 5        For the reasons that follow, we affirm the judgment of the trial court.[1]

¶ 6                                I. BACKGROUND

¶ 7        On July 14, 2010, the State indicted defendant with one count of armed violence, one count of armed habitual criminal, one count of possession of 900 grams or more of cocaine with intent to deliver, three counts of unlawful use of a weapon by a felon, and one count of possession of more than 500 grams, but less than 2000 grams, of cannabis with intent to deliver. Defendant opted for a jury trial and the State proceeded on the armed habitual criminal and possession of a controlled substance counts.

¶ 8        The evidence at trial showed that, on June 21, 2010, at approximately 8 a.m., officers executed an arrest warrant for defendant at an apartment in Tinley Park. James Duffy testified that he knocked on the door and announced himself as a police officer. He heard movement in the

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

apartment followed by the sound of an automatic weapon being loaded. After a SWAT team was summoned, investigators spoke with defendant by telephone and defendant insisted he was not in the apartment but that he was going to travel to a nearby courthouse to surrender himself. While defendant was on the phone with investigators, police fired a rubber bullet or dart through the window and the sound of glass breaking was heard over the phone. Defendant subsequently told investigators, "Don't kill me," and agreed to surrender. At about 12:15 p.m., a woman and two children left the apartment, followed by defendant, who was promptly arrested.

¶ 9    Following defendant's arrest, officers obtained and executed a search warrant. A search of the apartment yielded $20,879 in cash, 943.8 grams of cocaine, which was "broken up" as though it was being prepared for sale, and 619.7 grams of cannabis. Officers also recovered a revolver and a semiautomatic pistol. They observed documents bearing defendant's name on the dining room table but could not recall if the documents bore the apartment's address. They also recovered a pair of pants in which there was a credit card bearing defendant's name. Testimony established that a kilogram of pure cocaine, once adulterated with other substances to lower the purity and packaged for sale in gram or one-sixteenth of an ounce bags, could be worth upwards of $200,000.

¶ 10   Latorya Witcher testified that she and defendant had a son together, and she went to the apartment with her two sons on the evening of June 20, 2010, to meet defendant. She had never been to that apartment before, and she did not know who the tenant of the apartment was. However, she spent the night in the apartment with defendant and no one else was there. When the police arrived the following morning, defendant instructed her and her sons to go into the bedroom and close the door. She did not observe defendant with a gun, nor did she see the guns or drugs in the apartment. She testified she told Assistant State's Attorney (ASA) John Reich that she saw

defendant take an object out of a hall closet but she could not tell what the object was. She did not recall telling Reich that the object was a gun. She also denied seeing defendant holding a garbage bag or reaching into kitchen cabinets but admitted that she told Reich that she observed defendant do so. She also denied telling Reich what defendant did with the garbage bag, and specifically denied stating a belief that defendant was hiding guns or drugs in the bag.

¶ 11     Reich testified that Witcher told him she saw defendant remove a handgun that she believed to be a revolver from the closet, and that she watched defendant reach into a garbage bag, believing he deposited guns and drugs into the bag.

¶ 12     The remaining testimony did not directly tie defendant to the contraband. Investigators found no evidence that defendant rented or owned the Tinley Park apartment, and they did not attempt to speak with anyone who owned or leased the apartment. Forensic examination of the firearms recovered yielded no latent fingerprints suitable for comparison. During closing arguments, the State argued not only that defendant had constructive possession of the guns and drugs, but that defendant did, in fact, live in the apartment. The jury found defendant guilty of armed habitual criminal and the two counts of possession of a controlled substance.

¶ 13     Defendant subsequently retained different counsel who filed a posttrial motion alleging the ineffectiveness of trial counsel. First, defendant alleged that trial counsel provided ineffective assistance by failing to present evidence that Sean Paul Williams resided in the apartment because he received mail there and had a key. He also claimed that two witnesses, Florence Stone and Irene Wade, could have testified that defendant was unaware of and unconnected to any of the contraband in the apartment and that Williams had control of the apartment. Finally, he claimed there was documentary evidence to show Stone was the sole tenant of the apartment, while

defendant was a tenant elsewhere and did not have a key to the apartment in question. Defendant also claimed that trial counsel provided ineffective assistance by failing to object to some of Witcher's testimony and failing to cross-examine her adequately.

¶ 14    The posttrial motion was accompanied by affidavits of Stone, Wade, and defendant, as well as a signed but unnotarized statement from Williams. Stone averred that defendant did not live in the apartment and did not have a key or receive mail there. She also averred that Williams resided in the apartment with her, had a key, and received his mail there. The men's clothing in the apartment belonged to Williams. Stone averred that she told trial counsel she signed a lease to the apartment and that Williams lived there with her, but trial counsel told her he did not need to see the lease or interview Williams.

¶ 15    Wade, defendant's wife, averred that defendant did not reside in the Tinley Park apartment and that he resided at an apartment in Chicago Ridge with her. She averred that trial counsel never interviewed her. Defendant averred that he told trial counsel that Stone and Wade could provide evidence that he did not reside at the apartment and that Williams lived there with Stone.

¶ 16    Williams's statement maintained that he lived in the apartment with Stone, that he had a key to the apartment, and that he kept his clothes in the apartment. Williams stated that defendant did not live in the apartment or have a key, and that he kept drugs in the apartment.

¶ 17    Defendant also attached a copy of Stone's apartment lease and a photo of her driver's license with an address matching the leased apartment, a lease for a Chicago Ridge apartment in defendant's name, and multiple agreements and bills in defendant's name pertaining to the Chicago Ridge apartment.

¶ 18    At the hearing on defendant's motion, Williams invoked his right to refrain from self-incrimination when asked about the presence of guns or narcotics in the apartment on the day in question. Stone testified consistently with her affidavit and authenticated her lease. Wade testified consistently with her affidavit and authenticated defendant's lease for the Chicago Ridge apartment. She also testified that trial counsel told her he did not have to talk to her because he was going to win the case and would hang up on her. Defendant denied staying in the apartment with Witcher the night before his arrest. He claimed that he went to the Tinley Park apartment on June 21, 2010, to pick up Stone to take her to the hospital.

¶ 19    Between two sessions of the hearing, Williams wrote a letter to the trial court expressing regret for not testifying consistently with his statement. The trial court ruled that defendant could recall Williams, but he never did so.

¶ 20    Defendant's trial counsel, David Wiener, testified that he had no record, nor personal recollection, that defendant or any of defendant's friends or family advised him of potential witnesses in the case. He had no record or recollection of Williams and he had no recollection of meeting Stone. He testified that he met with Wade and was aware that defendant was not the leaseholder of the apartment in question and had made that argument at trial. He claimed that if he had been advised of any witnesses, he would have interviewed them and discussed them with defendant.

¶ 21    Investigator Michael Mendez testified that he searched the apartment in question and found no women's clothing, but he admitted he did not record the sizes of any of the clothing and defendant was not asked to try any of it on. The nightstand in the bedroom contained 10 medicine bottles bearing defendant's name and 17 or 18 of defendant's business cards. A pair of pants in the

living room contained 10 or 11 bank and credit cards in defendant's name. Approximately 45 documents in the apartment, including bills, email printouts, and court documents, bore defendant's name, though none bore the apartment's address. No documents in the apartment bore Williams's name.

¶ 22    The trial court denied defendant's posttrial motion, and specifically found trial counsel credible. On appeal, defendant argued that the trial court erred in denying his motion because he received ineffective assistance of counsel regarding trial counsel's failure to (1) call Stone or Wade; (2) investigate or call Williams as a witness; (3) object to portions of Witcher's testimony; and (4) properly cross-examine Witcher. We affirmed, holding that trial counsel did not provide ineffective assistance because he made strategic decisions regarding evidentiary objections and cross-examination, because he was unaware of Williams, and because testimony about who held the lease for the apartment would not have changed the outcome because the State had not attempted to show that defendant was the leaseholder. *People v. Wade*, 2014 IL App (1st) 123398-U, ¶¶ 37-39.

¶ 23    On December 17, 2018, defendant filed a motion for leave to file a petition for postconviction relief, which alleged the ineffectiveness of trial counsel, and that defendant was actually innocent of the offense. Defendant alleged that trial counsel failed to properly investigate witnesses, failed to communicate with defendant, and that trial counsel's license to practice law had been suspended by the Illinois Supreme Court due to, among other reasons, chronic alcoholism. Defendant also argued that the State failed to prove him guilty beyond a reasonable doubt of armed habitual criminal because the State failed to establish that defendant was the same individual as the one named in the prior convictions presented at trial. The record does not contain

the postconviction petition filed alongside the motion, nor any of the exhibits which defendant referenced in the motion. Nevertheless, on March 8, 2019, the trial court granted defendant leave to file a petition and docketed a petition for second-stage proceedings.

¶ 24 On June 7, 2019, the State filed a motion to dismiss defendant's petition. The State argued that defendant failed to establish cause and prejudice for his claim that trial counsel provided ineffective assistance. It also asserted that some of defendant's ineffective assistance of counsel claims were forfeited or barred by *res judicata*. The State also argued that defendant's actual innocence claim failed to satisfy the requisite elements of such a claim. Finally, the State argued that defendant's ineffective assistance of counsel claims could not satisfy the *Strickland* standard.

¶ 25 On October 18, 2019, defendant filed an amended postconviction petition, which does appear in the record. Defendant continued to allege his innocence and that he received ineffective assistance of trial counsel. The petition alleged that trial counsel repeatedly failed to communicate with defendant and failed to call Cortez Moore and Tony Windmon as eyewitnesses, and that their testimony would have exonerated defendant. He also alleged that trial counsel failed to present exculpatory evidence in the form of defendant's Illinois-issued identification card and other proof that defendant did not reside at the Tinley Park apartment. He also argued that trial counsel failed to interview Witcher, who attempted to inform trial counsel that she had been coerced into making a statement and testifying against defendant. Finally, defendant argued that he was improperly convicted of armed habitual criminal because the name and birthdate on the certified dispositions of prior convictions do not match his name and birthdate as alleged in this case, that trial counsel claimed to have filed a motion to suppress evidence when he did not, and that trial counsel was ineffective for stipulating to defendant's prior convictions.

¶ 26 Defendant completed an affidavit which averred that none of the drugs or weapons belonged to him and that he did not reside at the Tinley Park apartment. His belongings were in the apartment because they were contained in a duffel bag he brought with him when he stayed the night there with Witcher. Defendant also averred that trial counsel failed to communicate with him and did not communicate with potential witnesses who contacted him.

¶ 27 The petition also included an affidavit from Witcher which averred that on the morning of the police raid, she was in the apartment with defendant, Moore, and another man she did not know. After police knocked on the door, Moore and the unknown man exited the apartment, though she did not specify how. She averred that police coerced her into saying she saw defendant take a gun from the hallway closet by threatening to have the Department of Children and Family Services take her kids away. She also averred that she met with trial counsel in his office and expected to be questioned about what happened when defendant was arrested. Instead, he only spoke to her about payments for his representation. She described him as appearing intoxicated with bloodshot eyes. Witcher attempted to speak to trial counsel at the courthouse, but he refused to speak with her.

¶ 28 Defendant also supplied an affidavit from Nikolas Dunn, who averred that he would frequently hang out in the apartment in question with Moore, and that he would buy marijuana and weed from Moore. He also saw Moore with a .38 pistol at times. Dunn saw defendant inside Dixon Correctional Center and recognized him from times he saw defendant in the apartment. Dunn contacted Moore and Moore confirmed that defendant was incarcerated for drugs and a gun that belonged to Moore.

¶ 29    Next, defendant supplied an affidavit from Anthony Evans, who averred that he was Moore's cousin. In July 2010, Moore picked Evans up from the bus station and recounted how police recently raided a Tinley Park apartment and he had to make Witcher and defendant go into the bedroom while he stashed guns and drugs in a trash can. Moore slipped out of the apartment through the sliding glass doors and he told Evans that he planned to contact his lawyer and take full responsibility for the drugs and the gun.

¶ 30    Windmon averred that he was one of the occupants of the Tinley Park apartment, which he shared with Stone, Williams, and Moore. On June 21, 2010, Windmon entered the apartment with Moore at 6 a.m. Moore had a blue backpack and told Windmon he had drugs and laid a black, semi-automatic handgun on the table. Moore then removed bricks of cocaine from the backpack and separated it, giving some to Williams to deliver to another location. Defendant returned to the apartment around 7:30 a.m. after taking Stone to the hospital. At 7:45 a.m., someone knocked at the door. Moore looked through the peephole and informed the others that it was the police. Moore told defendant, Witcher, and her kids to go into the bedroom. He then placed something into his backpack before grabbing a garbage can and dumping the contents on the floor. Moore threw the guns and drugs into the now-empty garbage bag. Windmon and Moore fled out the back through the sliding glass door, leaving defendant and Witcher in the apartment. When Windmon found out that defendant had been charged with possessing what they left in the apartment, Windmon reached out to trial counsel, but trial counsel never returned his calls.

¶ 31    Finally, defendant attached an affidavit from Moore himself. Moore's account of the morning of June 21, 2010, was consistent with Windmon's. Moore averred that he had approximately three kilograms of cocaine, two pounds of weed, and about $20,700 in cash inside

the backpack he carried. He gave some of the cocaine to Williams, who left at about 7 a.m. Defendant returned from the hospital at about 7:30 a.m., and at 7:45 a.m., the police knocked on the door. Moore told defendant and Witcher to take the kids and go into the bedroom. Moore then placed ammunition, some scales, and plastic bags into his backpack. He emptied a garbage bag and placed the drugs, a revolver, a pistol, and an extra magazine at the bottom of the garbage can. He replaced the empty garbage back into the garbage can and exited the apartment through the back door. Moore averred that a black pouch in one of the hallway closets contained documents bearing his name, and he left personal items including clothing and shoes in the apartment. Moore met with trial counsel and attempted to tell trial counsel what happened at the apartment. Trial counsel smelled of alcohol and appeared to be drunk. Trial counsel informed Moore that he did not need Moore because "the State did not have a case."

¶ 32    Defendant also attached a copy of his lease for an apartment in Chicago Ridge. Defendant was listed as the tenant and the lease ran from October 1, 2009, to September 30, 2010. He also attached a copy of the lease for the apartment in Tinley Park. That apartment was leased to Stone, and the lease ran from July 30, 2009, to July 31, 2010. Defendant further attached a cable bill in his name for the address in Chicago Ridge.

¶ 33    Furthermore, defendant attached a complaint filed by the Illinois Attorney Registration and Disciplinary Commission (ARDC) on August 29, 2014. That complaint alleged that trial counsel, between 2004 and 2013 in multiple cases, repeatedly demonstrated a lack of competence, a lack of diligence, a failure to communicate, and a failure to return unearned fees. It also accused him of making misrepresentations about his actions to clients and clients' family members.

¶ 34 Defendant further attached a letter written by trial counsel. The letter is not printed on letterhead, contains no addressee or salutation, and is undated. However, the overall substance of the letter is a vociferous defense of trial counsel's conduct in defendant's case. One might surmise that it was a letter in response to an ARDC inquiry, but it is unclear. In the letter, trial counsel insisted that he "attempted to give [defendant] the most complete and effective defense possible" and that "[t]he jury verdict had absolutely nothing to do with me." It also asserted that he "was completely sober throughout the trial proceedings." It must be noted that the bulk of defendant's complaints about trial counsel revolved around his investigation of the case and defendant's attempts to communicate with him.

¶ 35 Finally, defendant attached an order from our supreme court. On September 21, 2015, trial counsel was ordered suspended from the practice of law for one year and until further order of court, but that suspension was stayed in its entirety by a two-year period of probation. That probation required trial counsel to abstain from the use of alcohol and unprescribed controlled substances, obtain treatment from a psychiatrist twice a month and comply with all treatment recommendations, and submit to random substance testing. Trial counsel was also ordered to enroll in a law office management program and establish a system for the handling of funds, a system for maintaining records, a diary and docketing system, a system by which telephone or written messages are responded to in a timely manner, and a system to provide clients with regular, itemized billing.[2]

---

[2]According to the ARDC's records on its website, of which we may take judicial notice, trial counsel's probation was revoked in 2016 and his license to practice law has since been suspended until further order of court. *BAC Home Loans Servicing, LP v. Popa*, 2015 IL App (1st) 142053, ¶ 21.

¶ 36    The State amended its motion to dismiss on November 22, 2019, adding an argument that defendant's petition was not timely filed.

¶ 37    On February 4, 2022, the trial court entered an order dismissing some of the claims in defendant's petition. Specifically, the trial court found that defendant's proposed new evidence from Witcher was not newly discovered, material, or conclusive. It also found that defendant's ineffective assistance of counsel claims were barred by *res judicata* or forfeiture and that defendant had not established cause and prejudice. However, it denied the State's motion to dismiss regarding defendant's actual innocence claim involving the affidavits of Moore, Dunn, Windmon, and Evans.

¶ 38    Defendant's petition proceeded to an evidentiary hearing on November 4, 2022. Moore testified that he was currently incarcerated in the Illinois Department of Corrections (IDOC) and that he knew defendant through his cousin, Stone. He described defendant as an acquaintance rather than a friend. Moore testified that he lived at the apartment in Tinley Park with Stone, Williams, and Windmon and that Stone was the leaseholder. He kept clothing in the apartment, along with personal documents like his birth certificate and parole papers. All four of them had keys to the apartment, but defendant did not.

¶ 39    On June 21, 2010, Moore returned to the apartment around 6 a.m. with Windmon. The two of them had been out partying. Moore was carrying a backpack that contained three kilograms of cocaine, a revolver, a .38 pistol, and scales. Once inside the apartment, Moore removed the drugs from the backpack to prepare them for sale. Williams and Witcher were both also in the apartment. Moore asked Williams about Stone's whereabouts, and Williams told him that defendant took her to the hospital.

¶ 40    Moore gave some of the cocaine to Williams and packaged the remaining cocaine in Ziploc bags. Williams left the apartment around 7 a.m. with his portion of the cocaine. Defendant returned to the apartment around 7:30 a.m. According to Moore, defendant did not live in the apartment, keep clothes or receive mail there, and he did not pay any of the bills. Moore also did not see defendant in the apartment often. Fifteen to twenty minutes after defendant arrived, someone knocked at the door and Moore went to investigate. He looked through the peephole and saw plain clothes police officers standing outside. He grabbed the contraband and tried to hide it in a garbage bag in the trash can in the kitchen by covering the contraband with the garbage. Moore told Witcher and defendant that the police were outside and told them to go into the bedroom.

¶ 41    Moore and Windmon then exited the apartment through a patio door that was not visible from the front of the apartment, and they did not tell defendant or Witcher that they were leaving. Moore spoke with trial counsel about his willingness to help defendant's case, but trial counsel never contacted him again.

¶ 42    Evans testified that in the summer of 2010, he had a conversation with Moore in which Moore told him that his apartment in Tinley Park was raided and that Moore left guns and drugs in a trash can in the apartment. Moore expressed sadness to Evans that defendant had been arrested for possession of Moore's contraband.

¶ 43    Dunn testified that he had been to Moore's apartment in Tinley Park multiple times and that he had purchased marijuana and cocaine from Moore multiple times. After encountering defendant inside Dixon Correctional Center and learning why defendant was incarcerated, Dunn reached out to a friend who confirmed that defendant had been prosecuted for Moore's guns and drugs.

¶ 44    The trial court denied defendant's petition after that hearing, finding that none of defendant's presented testimony satisfied the requirements of an actual innocence claim and that Moore's testimony was not credible, while the testimony of Dunn and Evans would be inadmissible hearsay at a retrial. Defendant subsequently appealed that ruling, as well as the dismissal of his ineffective assistance claim at the second stage.

¶ 45                                    II. ANALYSIS

¶ 46    Defendant raises three claims on appeal: (1) the trial court erred by denying defendant's actual innocence claim after a third-stage hearing; (2) postconviction counsel provided unreasonable assistance; and (3) the trial court erred by dismissing defendant's ineffective assistance of counsel claims at the second stage.

¶ 47    The Post-Conviction Hearing Act (the Act) provides a mechanism by which a defendant may raise a collateral attack against his or her conviction based on a claim of actual innocence or where there was a substantial denial of his or her rights under the Constitution of the United States, the State of Illinois, or both. 725 ILCS 5/122-1 *et seq.* The purpose of postconviction proceedings is to allow inquiry into constitutional issues involved in the original conviction and sentence that have not been, and could not have been, adjudicated previously on appeal. *People v. Buffer*, 2019 IL 122327, ¶ 12.

¶ 48    The Act sets out a three-stage process for the adjudication of postconviction petitions. *Id.* at ¶ 45. At the first stage, the trial court is only required to determine whether a petition is "frivolous or patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018); *Buffer*, 2019 IL 122327 at ¶ 45. A petition is frivolous or patently without merit when it has no arguable basis in law or in fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition which lacks an arguable basis

either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation. *Id*. An example of an indisputably meritless legal theory is one which is completely contradicted by the record. *Id*. Fanciful factual allegations include those which are fantastic or delusional. *Id*. at 17.

¶ 49    If the trial court does not dismiss the petition as frivolous or patently without merit, the petition advances to the second stage. *People v. Edwards*, 197 Ill. 2d 239, 245 (2001). Counsel is appointed to represent the defendant, if necessary, and the State is permitted to file responsive pleadings. *Edwards*, 197 Ill. 2d at 245; 725 ILCS 5/122-4 (West 2018); 725 ILCS 5/122-5 (West 2018). At the second stage, the trial court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *Edwards*, 197 Ill. 2d at 246. At the second stage, all well-pleaded facts not positively rebutted by the trial record are construed as true. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). A "well-pleaded fact" is one that is alleged in the petition, not positively rebutted by the original trial record, and properly supported by independent evidence. *People v. Delton*, 227 Ill. 2d 247, 256-58 (2008). The trial court's order dismissing a petition at the second stage is reviewed *de novo*. *Pendleton*, 223 Ill. 2d at 473.

¶ 50    Once a petition is advanced to the third stage of the process, an evidentiary hearing is held where the trial court may engage in fact-finding and credibility determinations. *Id*. We will not reverse the trial court's decision after a third-stage hearing unless it is manifestly erroneous. *Id*. A manifest error is one that is "clearly evident, plain, and indisputable." *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009).

¶ 51                                    A. Actual Innocence

¶ 52    We address first defendant's argument that the trial court erred when it denied defendant's actual innocence claim following a third-stage evidentiary hearing.

¶ 53    To establish a claim of actual innocence, the supporting evidence must be: (1) newly discovered; (2) material and not cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. *Id*. Evidence is material if it is relevant and probative of the petitioner's innocence. *Id*. Noncumulative evidence adds to the information that the fact finder heard at trial. *Id*. Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. *Id*. The conclusive character element of new evidence is the most important element of an actual innocence claim. *Id*.

¶ 54    Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id*. ¶ 48. The new evidence need not be entirely dispositive to be likely to alter the result on retrial. *Id*. Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. *Id*.

¶ 55    Here, the trial court determined that Moore's testimony was not newly discovered, and we agree. Moore's testimony placed him in the Tinley Park apartment on the morning of June 21, 2010, and in defendant's presence. Not only that, but Moore's testimony established that he was

willing to testify on defendant's behalf at trial and that he spoke with trial counsel about his willingness to help. Moore's testimony was undeniably discoverable through the exercise of due diligence and, therefore, could not possibly be considered newly discovered evidence.

¶ 56    Additionally, we can find no fault with the trial court's evaluation of Moore's testimony, which was by all accounts unbelievable. Moore insisted that he, Stone, Windmon, and Williams all lived together in the apartment, which was incredible given that the apartment had only one bedroom. It was even more unbelievable when comparing it to Witcher's trial testimony that she and defendant spent the night in the apartment on June 20, 2010—and Moore did not dispute that Witcher was staying in the apartment when he arrived on the morning of June 21, 2010. To believe that Stone was the only leaseholder of this one-bedroom apartment, but that three other people lived there and had keys, *and* additional individuals beyond those four slept there from time to time strains all common sense and credibility. Moreover, although the record does not contain the arrest warrant that precipitated the events of June 21, 2010, the police had some basis to believe that they could find defendant at the Tinley Park apartment, which appears to have been less of a home and more of a staging hub for the sale of drugs.

¶ 57    Moore's tale about his attempts to hide the drugs and his apparent escape from the apartment also makes little sense. According to Moore, he and Windmon escaped through a backdoor in the apartment and had no issue evading the law enforcement officers that were gathering outside. While the trial testimony does not set out a precise timeline for the arrival of additional officers and at what point the building was surrounded, it is exceedingly difficult to believe, as the trial court noted, that Moore and Windmon simply walked away from the apartment without issue as this standoff ensued. More importantly, if their escape was as trivial and

uneventful as Moore's testimony claimed, then his claim that they abandoned drugs worth hundreds of thousands of dollars and more than $20,000 in cash sends his testimony teetering into absurdity. If his flight was so uncontested, surely he would have brought everything with him. Nor does his testimony explain why defendant would opt for a law enforcement siege and an easily dispelled ruse about surrendering at a local courthouse instead of also choosing to flee via such an obvious and simple escape route. Moore's testimony also contradicted his affidavit as to whether he spoke with defendant before leaving the apartment and, as the trial court noted, Moore's credibility was further diminished by his status as a convicted felon. Thus, Moore's testimony was not so conclusive that it would probably change the result of defendant's case upon retrial.

¶ 58    As for the testimony of Evans and Dunn, we agree with the trial court that their testimony was newly discovered. However, the trial court correctly noted that this testimony could not change the result of defendant's trial because their testimony was comprised of inadmissible hearsay regarding Moore's out of court statements. Moreover, neither of them was present at the situs of the crime and could offer no firsthand evidence that would exonerate defendant or otherwise influence the question of whether defendant had constructive possession of the items in question. Additionally, as the State points out, the hearsay exception for statements made against the declarant's interest would not apply to their testimony because Moore was and is not unavailable. Ill. S. Ct. R. 804(b)(3) (eff. Jan. 1, 2011). Thus, their testimony, too, was not of such conclusive character that it would probably change result of defendant's case upon retrial.

¶ 59    Altogether, defendant's evidence did not establish the necessary elements of an actual innocence claim. Moore's testimony was not newly discovered, nor could it change the outcome of defendant's trial if it was. Likewise, the testimony of Evans and Dunn could also not change

the outcome of defendant's trial. The trial court was in the best position to evaluate the credibility of defendant's witnesses, and we will not disturb the trial court's determinations regarding a third-stage evidentiary hearing absent manifest error. *Pendleton*, 223 Ill. 2d at 473. Nothing about the trial court's ruling on this matter was error, let alone error that was "clearly evident, plain, and indisputable." *Ortiz*, 235 Ill. 2d at 333.

¶ 60　Accordingly, the trial court did not err in denying defendant's petition following a third-stage hearing.

¶ 61　　　　　　　　　　　B. Unreasonable Assistance of Counsel

¶ 62　Next, defendant argues that he received unreasonable assistance of postconviction counsel.

¶ 63　In postconviction cases, there is no constitutional right to counsel. *People v. Addison*, 2023 IL 127119, ¶ 19. Instead, the right to counsel is provided by statute, and petitioners are only entitled to a "reasonable level of assistance," which is less than that afforded by the federal and state constitutions. *Id*. This distinction is a rational one because trial counsel plays a different role than postconviction counsel. *Id*. At trial, counsel acts as a shield to protect a defendant from being stripped of the presumption of innocence. *Id*. But defendants in a postconviction posture have already been stripped of their presumption of innocence and have generally failed to obtain relief on direct appeal. *Id*. Thus, postconviction counsel is meant not to protect a defendant from the prosecutorial forces of the State, but to shape defendants' claims into the proper legal form and present those claims to the court. *Id*.

¶ 64　Defendant first insists that error occurred because neither attorney representing him during the postconviction proceedings below filed the certificate required by Supreme Court Rule 651(c). Ill. S. Ct. R. 651(c) (eff. July 1, 2017). But that requirement only applies to postconviction petitions

filed by a *pro se* petitioner. *People v. Cotto*, 2016 IL 119006, ¶ 41. Nevertheless, we do not condition the reasonable level of assistance standard on the applicability of that rule. *Id*. The reasonable assistance standard applies generally to all postconviction defendants without reference to Rule 651(c). *Id*. This standard also applies to third-stage proceedings. *People v. Urzua*, 2023 IL 127789, ¶ 51. While Rule 651(c) does not apply, and a *Strickland* standard of ineffective assistance may not be directly applicable, "the *Strickland* test is an essential standard for comparison." *People v. Pabello*, 2019 IL App (2d) 170867, ¶ 36 (quoting *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 37); see also *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If postconviction counsel's assistance cannot be deemed ineffective under *Strickland*, it cannot be deemed unreasonable under the Act. *Pabello*, 2019 IL App (2d) 170867, ¶ 36; see also *People v. Zareski*, 2017 IL App (1st) 150836, ¶ 59.

¶ 65    The remainder of defendant's contentions as to why he did not receive reasonable assistance of postconviction counsel are not persuasive. Defendant claims that one of his two postconviction attorneys entered an appearance but otherwise did not sign any of the pleadings or "perform any duties on the record." Defendant's other attorney signed all the pleadings and presented all the testimony at the evidentiary hearing. Defendant does not identify any actual prejudice he suffered from this fact, but instead only assumes that some prejudice occurred because one of his attorneys performed no substantive action.

¶ 66    Defendant next claims that he received unreasonable assistance because postconviction counsel did not allege the ineffectiveness of counsel who prepared the posttrial motion by pointing out multiple other allegations that defendant made regarding trial counsel's performance in a *pro se* pleading filed after trial. But the record before us provides us with no way to evaluate the merit

of these claims or what specific prejudice defendant suffered as a result of posttrial counsel's alleged ineffectiveness. Indeed, defendant's argument does not attempt to demonstrate how his complaints amounted to errors that could have changed the outcome of his case, or how we might overcome the presumption that posttrial motion counsel made strategic decisions about what claims to present and what claims to abandon.

¶ 67 Defendant also argues that postconviction counsel provided unreasonable assistance by not calling Windmon at the evidentiary hearing. We can only speculate why Windmon was not called to testify, and nothing in the record before us can dispel the possibility that there were valid, strategic reasons for not calling Windmon.

¶ 68 Finally, defendant claims that postconviction counsel provided unreasonable assistance by making a typographical error in Moore's affidavit, which the trial court seized upon as a reason to doubt Moore's credibility. Even assuming that postconviction counsel did make a mistake rather than it being an attempt by Moore to salvage an actual inconsistency, it was not the only reason to doubt his credibility. The trial court also found Moore's overall explanation of the events of that morning unbelievable and noted Moore's status as a felon as another reason to discredit him. It is clear that even if postconviction counsel made a typographical error in Moore's affidavit, the absence of that error would not have changed the trial court's evaluation of Moore's testimony.

¶ 69 Accordingly, defendant has failed to demonstrate that he received unreasonable assistance of postconviction counsel.

¶ 70                              C. Ineffective Assistance of Counsel

¶ 71 Finally, we address defendant's contention that the trial court erred in dismissing his ineffective assistance of counsel claims at the second stage. The primary claims raised in his

petition were that trial counsel provided ineffective assistance for failing to interview Moore and Windmon to exonerate defendant and failing to interview Witcher. However, defendant's petition also claimed that trial counsel provided ineffective assistance by failing to present evidence regarding the address on defendant's State of Illinois identification card (ID) and other evidence of defendant's residence, misrepresenting to defendant that he had filed a motion to suppress evidence, and by stipulating to defendant's prior convictions.

¶ 72 The trial court held that defendant's ineffective assistance claims had either already been raised on direct appeal, and thus were barred by the doctrine of *res judicata*, or forfeited because they were not raised on direct appeal. Issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata* and issues that could have been raised, but were not, are waived. *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002).

¶ 73 We cannot agree with the trial court's assessment that all of these claims were barred by *res judicata* or forfeiture. In particular, defendant's claims regarding Witcher, Moore, and Windmon are not barred by *res judicata*. On direct appeal, the only ineffective assistance of counsel claims that defendant made regarding Witcher were that trial counsel did not object to improper testimony and did not cross-examine her properly about the memorandum which contained her statement that police coerced her. *Wade*, 2014 IL App (1st) 123398-U, ¶¶ 33, 38. We held specifically that trial counsel's decision not to cross-examine on this point was a strategic decision because it might have prompted a line-by-line examination of Witcher's statement, most of which was not provided to the jury. *Id*. ¶ 38. But defendant's argument now centers around the fact that trial counsel never interviewed Witcher or made any attempt to do so in order to investigate her claims in any detail.

¶ 74 Defendant's direct appeal claims relied on different operative facts from those raised in his petition and therefore do not bar defendant's current ineffective assistance of counsel claims. See *People v. Poole*, 2022 IL App (4th) 210347, ¶ 88. Defendant, relying on facts outside the trial record, now essentially argues that the decision not to cross-examine Witcher on this point was less about strategy and more because trial counsel never investigated her claim. Defendant's claims that trial counsel failed to interview or call Windmon or Moore as witnesses were also never raised on direct appeal and therefore could not be barred by *res judicata*.

¶ 75 However, defendant's claims regarding his State of Illinois ID and other evidence regarding his true address were properly found to be barred by *res judicata* by the trial court. On direct appeal, we previously considered whether trial counsel was ineffective for not presenting evidence of defendant's address and affirmed on the basis that it would not have changed the outcome because the State did not argue that defendant was the leaseholder for the Tinley Park apartment. *Wade*, 2014 IL App (1st) 123398-U, ¶ 37. Whatever the piece of evidence in question, these claims involve the same operative facts as those raised on direct appeal—that trial counsel should have presented evidence of defendant's address.

¶ 76 Defendant's claims regarding Witcher, Moore, or Windmon were also not forfeited. Defendant's ineffective assistance of counsel claims with respect to Moore, Windmon, and Witcher are based on what trial counsel should have done, and not on what trial counsel did. An ineffective assistance claim based on what the record discloses counsel did, in fact, do is subject to the usual procedural default rule. *People v. Tate*, 2012 IL 112214, ¶ 14. "But a claim based on what ought to have been done may depend on proof of matters which could not have been included in the record precisely because of the allegedly deficient representation." *Tate*, 2012 IL 112214,

¶ 14 (quoting *People v. Erickson*, 161 Ill. 2d 82, 88 (1994)). Thus, failing to include a claim in a posttrial motion may not preclude an ineffective assistance claim for what trial counsel allegedly ought to have done in presenting a defense. *Tate*, 2012 IL 112214, ¶ 14.

¶ 77 The State also asserts that the cause-and-prejudice test for successive petitions bars consideration of defendant's claims. But defendant's petition was not a successive petition. Instead, it was his first petition that was filed beyond the statutory deadline. This Court has taken differing positions as to whether the cause-and-prejudice test applies to untimely filed initial petitions depending on the factual circumstances. For example, in *People v. Walker*, the petitioner argued that the cause-and-prejudice test should be used to excuse the untimely filing of his postconviction petition. *People v. Walker*, 331 Ill. App. 3d 335, 345 (2002). We rejected that argument, holding that, as a general rule, the Act already provided a framework for whether an untimely initial petition should be excused: whether the petitioner can show that the delay is not due to his own culpable negligence. *Id*.

¶ 78 However, in *People v. Sanders*, we applied the cause-and-prejudice test in a unique factual scenario where the "culpable negligence" framework did not suffice. *People v. Sanders*, 393 Ill. App. 3d 152, 171 (2009). There, the petitioner deliberately allowed the filing period to run and then filed a postconviction petition once the law had evolved into a more favorable state. *Id*. We held that such a situation was analogous to one where a petitioner filed a successive petition because of a change in the law after the rejection of his first petition. *Id*. at 172.

¶ 79 Section 122-1(c) of the Act maintains that, if a petition for certiorari is filed, then a postconviction petition must be filed within six months of the conclusion of proceedings in the United States Supreme Court. 725 ILCS 5/122-1(c) (West 2018). If a petition for certiorari is not

filed, the postconviction petition must be filed within six months of the date for filing a petition for certiorari. *Id*. If a postconviction petition is filed outside of that timeframe, the petitioner must demonstrate that the delay was not due to his own culpable negligence. *Id*. That section of the Act says nothing about the cause-and-prejudice test, which is only referenced in another subsection that pertains specifically to successive petitions. 725 ILCS 5/122-1(f) (West 2018).

¶ 80 Here, the State has only asserted that defendant failed to establish cause and prejudice for his arguments, and it has not provided any reason as to why this is a circumstance where the cause-and-prejudice test should apply rather than the Act's untimeliness provision. This is not a scenario where defendant intentionally waited until the state of the law evolved in defendant's favor to file his first postconviction petition such that we would be justified applying the reasoning in *Sanders*. Rather, his filing was predicated on the acquisition of evidence he did not previously have, due to the alleged ineffective assistance of trial counsel, and the outcome of trial counsel's disciplinary proceedings. We also note that, although the State asserted the untimeliness of defendant's petition below, it has not renewed that argument before this Court, and we will not resurrect that argument on the State's behalf.

¶ 81 That brings us to the merits of defendant's second-stage ineffective assistance claims where we must answer whether defendant's allegations, if proven at a third-stage evidentiary hearing, would entitle defendant to a new trial. *People v. Sanders*, 2016 IL 118123, ¶ 31.

¶ 82 Criminal defendants are guaranteed the right to the effective assistance of counsel. U.S. Const. amends. VI, XIV; Ill. Const. 1970, art. 1, § 8; *Strickland*, 466 U.S. at 685. To sustain a claim of ineffective assistance of counsel, one must show both that defense counsel's performance was deficient, measuring it against an objective standard of competence under prevailing

professional norms, and that but for counsel's deficient performance, there was a reasonable probability that the outcome of the case would have been different. *Strickland*, 466 U.S. at 687, 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id.* at 686. However, judicial scrutiny of counsel's performance must be highly deferential. *Id.* Courts indulge in a strong presumption that counsel's performance fell within a wide range of reasonable professional assistance, and a defendant must overcome the presumption that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689.

¶ 83 Thus, the question becomes, if defendant could prove his claims at an evidentiary hearing, would there be a reasonable probability that the outcome of defendant's trial would have been different? This requires an examination of the issue of constructive possession in this case and whether this additional evidence that trial counsel allegedly failed to investigate would have undermined the State's constructive possession case against defendant.

¶ 84 Knowing possession can be either actual or constructive. *People v. Faulkner*, 2017 IL App (1st) 132884, ¶ 39. To establish constructive possession, the State must prove that the defendant: (1) had knowledge of the presence of the item and (2) exercised immediate and exclusive control over the area where the item was found. *Id.* "Knowledge may be proven by evidence of a defendant's acts, declarations or conduct from which it can be inferred he knew the contraband existed in the place where it was found." *Id.* (quoting *People v. Ross*, 407 Ill. App. 3d 931, 936 (2011)). "Control is established when a person has the 'intent and capability to maintain control

and dominion' over an item, even if he lacks personal present dominion over it." *Id*. (quoting *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17). Control over the area where contraband was found gives rise to an inference that the defendant possessed the contraband. *Id*. Exclusive control may be established even though possession is joint or other persons have access to the premises. *People v. Griffin*, 194 Ill. App. 3d 286, 292 (1990). However, a person's knowledge of the place or location of the item alleged to be possessed is not the equivalent of possession. *People v. Wise*, 2021 IL 125392, ¶ 28.

¶ 85    Defendant claims that, with the additional evidence trial counsel should have presented, this case is like *People v. Terrell*, where we reversed a defendant's conviction for possession of a controlled substance. *People v. Terrell*, 2017 IL App (1st) 142728, ¶ 33. In that case, police executed a search of an apartment and found drugs and guns in a secret compartment in a hallway closet. *Id*. ¶¶ 8-9. The apartment's lessee, who was not the defendant, refused to let the officers in and the officers subsequently forced entry. *Id*. ¶ 4. A search of the dining room yielded two prescription bottles with the defendant's name on them, the defendant's passport, and the defendant's probation card. *Id*. ¶ 5. The defendant was present in a framed photograph in the living room. *Id*. ¶ 7. During the search of the apartment, an FBI agent went to his car and observed the defendant sitting in a pick-up truck just outside the apartment. *Id*. ¶ 10. The agent engaged the defendant in conversation and asked him to come inside where the defendant was arrested. *Id*. The defendant had no contraband on his person, but his truck had a hidden compartment similar in design to the hallway compartment, which was empty. *Id*. ¶ 11.

¶ 86    We reversed, noting that none of the defendant's property was in the same room as the contraband, the contraband was hidden in a secret compartment, which undercut any argument

that the defendant knew of its existence, and that the State failed to prove that the defendant had ever been in the apartment. *Id*. ¶¶ 25, 30-31.

¶ 87    This case is unlike *Terrell*, with or without the additional evidence defendant argues should have been introduced by trial counsel. In fact, taking defendant's factual allegations and affidavits attached to his petition as true,[3] they present such a tangled web of differing versions that the testimony of their authors at retrial would likely improve the State's case.

¶ 88    For the purposes of our analysis, we take as true the allegation that Witcher was coerced into saying she saw defendant handling a gun. Other than that fact, the trial evidence of defendant's knowledge of the contraband and intent to maintain control of it was circumstantial. That evidence established the following facts. Police arrived at the Tinley Park apartment on June 21, 2010, to execute an arrest warrant for defendant. Although the record does not detail how the police knew defendant would be at that apartment, it inferentially appears that they had at least some information that defendant was tied to that apartment and knew to find him there. The evidence recovered inside the apartment supports that conclusion, as defendant had a number of belongings inside. Police recovered business cards from a nightstand in the apartment's only bedroom that bore defendant's name and photograph. They also recovered from the same nightstand medication bottles that bore defendant's name. The hamper in the same bedroom, which had no lid, contained

---

[3]We recognize the oddity this case presents wherein Moore did, in fact, testify at an evidentiary hearing to the same facts that comprise some of the content of defendant's ineffective assistance of counsel claim—testimony which the trial court found incredible. Nevertheless, review of second-stage proceedings prohibits us from performing fact-finding or credibility determinations, and there is no way of knowing what other evidence defendant or the State might have presented at an evidentiary hearing on defendant's ineffective assistance claim. Thus, we consider only the well-pleaded facts in defendant's petition and do not take into account the trial court's credibility determinations as they pertain to defendant's actual innocence claim or our discussion of that claim.

a bag inside which police found ammunition, some scales, and cannabis. Numerous documents bearing defendant's name were also found on a table in the living room. While the State presented no evidence of a lease for that apartment with defendant's name on it at trial, myriad pill bottles, an assortment of business cards, and personal documents were strongly indicative that defendant was staying in the apartment in some capacity.

¶ 89    Given that evidence, we cannot say the evidence from Witcher, Moore, and Windmon that defendant argues should have been discovered and presented would change the outcome. Although we are ordinarily required to accept all well-pleaded facts as true, in this case it is virtually impossible to do so as some of the allegations in defendant's petition and attached affidavits are inherently contradictory. For example, Witcher's affidavit claims that Moore told her to stay in the bedroom with her children and that he shut the door. From the bedroom she heard movement and panicked voices, and when she finally opened the door, defendant was the only person left in the apartment—indicating that defendant was with Moore and Windmon while Moore was stashing the drugs and weapons in the garbage can. But Moore's affidavit tells a different story—that he told defendant and Witcher to go into the bedroom with the kids and only then did they stash the drugs and guns in the garbage, and that he and Windmon left without defendant's knowledge. Both accounts cannot be true, and if they were both presented at a retrial, that would no doubt harm defendant's argument that he was not involved with the contraband.

¶ 90    Defendant's own affidavit in his petition cannot be construed as true because it is rebutted by his prior testimony. At the evidentiary hearing on defendant's posttrial motion, defendant insisted that he was not with Witcher on June 21, 2010, though he had seen her at Stone's apartment when he went to pick up Stone to take her to the hospital. But his affidavit in his petition asserted

that his belongings were in the Tinley Park apartment because they were in a duffel bag he used for work—a duffel bag he left in the bedroom that he "had used the night before with Ms. Witcher." Presumably this also means that defendant has abandoned his testimony at the evidentiary hearing that he went to the Tinley Park apartment on the morning of June 21, 2010, to take Stone to the hospital. Even defendant cannot consistently account for his whereabouts and conduct leading up to his arrest.

¶ 91    Witcher's affidavit also demonstrated that her testimony would not change the outcome of defendant's case. Consistent with her trial testimony, she averred that she went to the Tinley Park apartment to see defendant for Father's Day on June 20, 2010. She had never been to the apartment before and, after dinner and a movie, she stayed the night with defendant in the apartment. Thus, even accepting as true that Witcher was coerced into saying she saw defendant take a gun from the closet by police, her testimony and affidavit shows defendant as having some measure of control over the Tinley Park apartment—he had the ability to sleep in its only bedroom and have overnight guests while the legal tenant was apparently nowhere to be found.

¶ 92    Furthermore, Witcher's affidavit stated that when she woke up on June 21, 2010, there were three men in the apartment: defendant, Moore, and another man she did not know. Her affidavit said nothing about Stone's presence—which is impossible to reconcile with the affidavits of Windmon and Moore that maintain that defendant was not at the apartment when they arrived because he took Stone to the hospital. Moore and Windmon's affidavits also maintained that Williams was at the apartment when they arrived at 6 a.m., but Witcher's and defendant's affidavits were silent as to Williams's presence at any point prior to that including the night before.

¶ 93    At trial, trial counsel argued that defendant had no knowledge of the presence of the drugs, and that is why he did not attempt to destroy them during the four-hour standoff with police. But according to either Witcher's or Moore's account, defendant must have been aware of the presence of the drugs, which would eliminate the ability to make such an argument. In fact, the inverse argument—that defendant did not destroy them precisely because he was aware of them and intended to continue possessing them—would be relatively easy to make. Defendant's control over the premises, as evidenced by the fact that he was staying there, had numerous possessions there, could sleep there without the leaseholder's presence, and could apparently come and go as he pleased permits an inference that he possessed the contraband. *Faulkner*, 2017 IL App (1st) 132884, ¶ 39. The fact that Moore admitted to ownership of the contraband would not exonerate defendant because it would not nullify defendant's control over the area and the contraband as exclusive control can be had jointly. *Griffin*, 194 Ill. App. 3d at 292. Indeed, we have long held that ownership is not a necessary prerequisite for constructive possession. *O'Neal*, 35 Ill. App. 3d at 91.

¶ 94    The accounts of Witcher and Moore would also demonstrate that Moore and Windmon abandoned a fortune's worth of drugs to make their escape—an apparently easy feat—while defendant, fully aware of the drugs' presence, remained in control of the apartment despite the availability of a clear escape route. In fact, he was so adamant about remaining that he barricaded himself in the apartment and prompted a four-hour siege by local law enforcement until he finally surrendered—but not before attempting to throw police off his trail by concocting a story about surrendering at a local courthouse. If defendant truly had no knowledge of the presence of the

contraband and no intent to maintain control of the premises and its contents, his conduct said the opposite.

¶ 95    Altogether, if we accept as true that trial counsel never interviewed Witcher, Moore, and Windmon, and that they would have testified in accordance with their affidavits in this case had they been interviewed, it would not have changed the outcome of defendant's trial.

¶ 96    Lastly, we address the claims that trial counsel was ineffective for failing to file a motion to suppress evidence and for stipulating to defendant's prior convictions. Defendant's brief refers to these claims only in passing and mounts no argument for either as to how he made a substantial showing of a constitutional violation. We decline to do so for him.

¶ 97    Accordingly, regardless of what trial counsel did or did not fail to do, defendant has not demonstrated the requisite prejudice to make a substantial showing that he received ineffective assistance of counsel. The trial court did not err in dismissing his ineffective assistance of counsel claims at the second stage.

¶ 98                                    III. CONCLUSION

¶ 99    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 100   Affirmed.